**15-2836-cv**
*Betances v. Fischer*

# In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM, 2015

ARGUED: MARCH 28, 2016
DECIDED: SEPTEMBER 16, 2016

No. 15-2836-cv

PAUL BETANCES, individually and on behalf of others similarly situated, LLOYD A. BARNES, and GABRIEL VELEZ, a/k/a GABRIEL BELIZE, individually and on behalf of others similarly situated,
*Plaintiffs-Appellees,*

*v.*

BRIAN FISCHER, individually and in his capacity as Commissioner of the New York State Department of Correctional Services (DOCS), ANTHONY J. ANNUCCI, individually and in his capacity as Deputy Commissioner and Counsel for the New York State Department of Corrections and Community Supervision, and TERENCE TRACY, in his individual capacity and in his capacity as Chief Counsel for the Division of Parole,
*Defendants-Appellants.*

————

Appeal from the United States District Court
for the Southern District of New York.
No. 11 Civ. 03200 – Shira A. Scheindlin, *Judge.*

———

Before: WALKER, RAGGI, and DRONEY, *Circuit Judges*.

———

In *Earley v. Murray*, 451 F.3d 71 (2d Cir. 2006) ("*Earley I*"), we held that the New York State Department of Correctional Services's ("DOCS") practice of administratively adding a term of post-release supervision ("PRS") to sentences in which PRS had not been imposed by the sentencing judge and the New York State Division of Parole's ("DOP") practice of enforcing the administratively added PRS terms violated the Constitution. Notwithstanding their awareness of our holding, defendants DOCS officials Anthony J. Annucci and Brian Fischer and DOP official Terence Tracy decided not to follow it and only did so after the New York Court of Appeals invalidated the administrative practice more than 22 months later. The plaintiffs, offenders who had been subject to PRS in violation of *Earley I*, sued the defendants for the actions they took in violation of *Earley I* and moved for summary judgment. The district court (Scheindlin, *J.*) granted the motion. The defendants appeal the grant of summary judgment and also argue that the district court erred in granting plaintiffs' motion to deem the appeal frivolous so that the district court could retain jurisdiction and proceed with a trial on damages. We AFFIRM.

————

HAYLEY HOROWITZ (Matthew D. Brinckerhoff, Alanna Small, *on the brief*), Emery Celli Brinckerhoff & Abady LLP, New York, NY, *for Plaintiffs-Appellees*.

STEVEN C. WU, Deputy Solicitor General (Barbara D. Underwood, Solicitor General; Claude S. Platton, Senior Assistant Solicitor General, *on the brief*), *for* Eric T. Schneiderman, Attorney General of the State of New York, *for Defendants-Appellants*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

In *Earley v. Murray*, 451 F.3d 71 (2d Cir. 2006) ("*Earley I*"), we held that the New York State Department of Correctional Services's ("DOCS") practice of administratively adding a term of post-release supervision ("PRS") to sentences in which PRS had not been imposed by the sentencing judge and the New York State Division of Parole's ("DOP") practice of enforcing the administratively added PRS terms violated the Constitution. Notwithstanding their awareness of our holding, defendants DOCS officials Anthony J. Annucci and Brian Fischer and DOP official Terence Tracy decided not to follow it and only did so after the New York Court of Appeals invalidated the administrative practice more than 22 months later. The plaintiffs, offenders who had been subject to PRS in violation of

*Earley I*, sued the defendants for the actions they took in violation of *Earley I* and moved for summary judgment. The district court (Scheindlin, *J.*) granted the motion. The defendants appeal the grant of summary judgment and also argue that the district court erred in granting plaintiffs' motion to deem the appeal frivolous so that the district court could retain jurisdiction and proceed with a trial on damages. We AFFIRM.

## BACKGROUND

### I.   Determinate Sentencing and Post-Release Supervision in New York

In 1998, the New York State Legislature amended the sentencing scheme for violent felons to require that every determinate sentence of imprisonment for a violent felony be followed by a PRS term. N.Y. Penal Law § 70.45(1). The statute fixes the length of PRS terms for certain crimes and provides a range of permissible lengths for others, leaving the ultimate determination to the sentencing judge. *Id.* § 70.45(2), (2-a). During the time period relevant to this case, the Division of Parole ("DOP") and Board of Parole ("BOP") established and enforced the conditions of PRS terms and the Department of Correctional Services ("DOCS") reincarcerated felons who violated these conditions. *Id.* § 70.45(3).[1]

---

[1] In 2011, after the events giving rise to this lawsuit, DOCS and DOP merged to create the Department of Corrections and Community

Although § 70.45(1) requires sentencing courts to "state not only the term of imprisonment, but also an additional period of post-release supervision," some judges did not pronounce PRS terms during sentencing proceedings. As a result, certain inmates entered DOCS custody with sentence and commitment orders that informed DOCS employees of the term and conditions of the inmate's sentence, but failed to include PRS terms required by § 70.45. Instead of bringing the failure to the attention of the sentencing court, DOCS simply added the PRS term administratively.

When DOCS first took custody of an inmate, it received the inmate's sentence and commitment order. DOCS employees routinely entered information about the inmate's sentence from this document into the DOCS computer system. If a sentence and commitment order did not include the PRS term that § 70.45 required, DOCS employees, following guidelines issued by DOCS, entered for the inmate the shortest PRS term permitted by § 70.45.

Upon their release from prison, the inmates began to serve their PRS terms under DOP supervision. Approximately 45 days before an inmate left prison, DOCS employees calculated the specific

Supervision ("DOCCS"). Under the current version of § 70.45, DOCCS has the role formerly assigned to DOCS and DOP, and the Board of Parole ("BOP") remains an independent body that sets PRS conditions.

dates on which that inmate's PRS would begin and end and furnished these dates to DOP employees. Before beginning supervision of an inmate, a DOP parole officer would meet with the inmate to discuss the inmate's plans for his release and the conditions of his PRS. At the same time DOP provided the inmate with a document containing information about the inmate's crime and sentence, including his release date and the date on which any PRS would expire. DOCS and DOP were authorized to reincarcerate an offender who, after a hearing, was found to have violated the conditions of his release.

## II.    Our Decision in *Earley v. Murray*

On June 9, 2006, we decided *Earley v. Murray*, 451 F.3d 71 (2d Cir.) ("*Earley I*"), *reh'g denied*, 462 F.3d 147 (2d Cir. 2006) ("*Earley II*"), in which we addressed for the first time the constitutionality of DOCS's practice of adding a PRS term to a sentence in cases where § 70.45 required it but the sentencing judge had not imposed it. Earley pleaded guilty to attempted burglary and was sentenced to six years in prison. *Earley I*, 451 F.3d at 73. The sentencing judge failed to include PRS in the sentence he pronounced in court and neither the written judgment nor the written order of commitment indicated that PRS was to be a part of Earley's sentence, notwithstanding the requirement under § 70.45 that he serve a term of PRS upon the conclusion of his term of imprisonment. *Id.* While

he was incarcerated, Earley became aware that DOCS had administratively added a five-year PRS term to his sentence. *Id.* After exhausting his state court remedies, Earley filed a habeas petition in federal court arguing that DOCS's administrative imposition of PRS violated his due process rights. *Id.*

We agreed with Earley that the Constitution forbids DOCS from modifying a sentence imposed by a judge, even though § 70.45 required that PRS be a part of his sentence. *Id.* at 74-76. Because Earley's PRS term had not been imposed by the judge, PRS was never part of his sentence and the PRS term was a "nullity." *Id.* at 76. We remanded the case to the district court for a determination of whether Earley had timely filed his habeas petition; if so, the district court was "to issue a writ of habeas corpus excising the term of post-release supervision from Earley's sentence and relieving him of any subsequent penalty or other consequence of its imposition." *Id.* at 76-77. We also noted that "[o]ur ruling is not intended to preclude the state from moving in the New York courts to modify Earley's sentence to include the mandatory PRS term," although we left it to the state courts to determine if such a motion would be timely. *Id.* at 77 & n.2. On August 31, 2006, we denied the defendants' motion for rehearing in *Earley II.*

### III. The General Response to *Earley I*

The holding in *Earley I* was met with resistance at the state level. Certain district attorneys expressed their disagreement with our holding. Officials in the Office of Court Administration ("OCA"), the administrative division of the New York state court system, took the position that the opinion in *Earley I* was not binding on state courts and issued a memorandum to judges expressing this view. OCA nevertheless urged courts to pronounce PRS terms going forward until the New York Court of Appeals had the opportunity to weigh in.

New York courts were inconsistent in adhering to *Earley I*'s holding. The Second and Fourth Departments applied *Earley I* from the outset. *See People v. Smith*, 37 A.D.3d 499, 499, 829 N.Y.S.2d 226 (2d App. Div. 2007); *People ex rel. Burch v. Goord*, 48 A.D.3d 1306, 1307, 853 N.Y.S.2d 756 (4th App. Div. 2008). The First and Third Departments did not apply *Earley I*'s holding when it was first decided but later did. *Compare People v. Thomas*, 35 A.D.3d 192, 826 N.Y.S.2d 36 (1st App. Div. 2006) (analyzing unpronounced PRS with reference to *Earley I* but without applying its holding), *aff'd as modified and remanded sub nom. People v. Sparber*, 10 N.Y.3d 457, 889 N.E.2d 459 (2008), *and Garner v. N.Y.S. Dep't of Corr. Servs.*, 39 A.D.3d 1019, 831 N.Y.S.2d 923 (3d App. Div. 2007) (analyzing unpronounced PRS without reference to *Earley I*), *rev'd,* 10 N.Y.3d

358, 889 N.E.2d 467 (2008), *abrogated by Dreher v. Goord*, 46 A.D.3d 1261, 848 N.Y.S.2d 758 (2007), *with People v. Figueroa*, 45 A.D.3d 297, 298, 846 N.Y.S.2d 87 (1st App. Div. 2007) (applying *Earley I*'s holding, though without reference to *Earley I*), *and Dreher v. Goord*, 46 A.D.3d 1261, 1262, 848 N.Y.S.2d 758 (3d App. Div. 2007) (applying *Earley I*).  *See also Scott v. Fischer*, 616 F.3d 100, 107 (2d Cir. 2010) (describing how the First and Third Departments' initial failure to apply *Earley I* "reflect[ed] oversight rather than defiance").

On April 29, 2008, the New York Court of Appeals weighed in on the question whether it was permissible for DOCS to add PRS to sentences after the sentencing judge had failed to pronounce a PRS term in *People v. Sparber*, 10 N.Y.3d 457, 889 N.E.2d 459 (2008), and *Garner v. New York State Department of Corrections Services*, 10 N.Y.3d 358, 889 N.E.2d 467 (2008).  The Court held that New York state law required the judge to pronounce the term of PRS orally at sentencing if it was to be included in an inmate's sentence, but it did not address whether the Constitution required sentencing judges to pronounce PRS terms, as we had held in *Earley I*.  *Sparber*, 889 N.E.2d at 469-70; *Garner*, 889 N.E.2d at 362-63.

**IV.    The Actions of the Defendants after *Earley I***

The three defendants in this case were officials with DOCS (Annucci and Fischer) and DOP (Tracy) who were responsible for designing and implementing their departments' response to *Earley I*.

**A.  Anthony J. Annucci**

Anthony J. Annucci was DOCS's counsel from September 1989 until October 2007, when he became executive deputy commissioner and counsel, a position he filled until December 2008.

Annucci immediately understood *Earley I*'s holding but deliberately refused to change DOCS procedures to bring them into compliance.  In July 2006, soon after *Earley I* was decided, Annucci emailed OCA's counsel to inform him of *Earley I*'s holding and to urge that the New York courts follow *Earley I* prospectively.  He also cautioned OCA that inmates would probably file individual suits to relieve them from their administratively imposed PRS terms.

In August 2006, Annucci emailed DOCS personnel to inform them that *Earley I* conflicted with New York state law and that DOCS would not follow its holding.  Annucci confirmed his decision not to follow *Earley I* at his deposition:

> **Q:** You've read [*Earley I*], you made decisions about policy for DOCS based on that opinion, right?
> **A:** I didn't make any decisions to change policy.
> **Q:** Right, you made a decision to either take action or not take action after *Earley*, right?
> **A:** Correct.
> **Q:** You made the decision to take action in notifying the courts to deal with the problem prospectively?
> **A:** Correct.
> **Q:** You made the decision not to take any action retroactively until further notice, right?
> **A:** Correct.

> **Q:** And you made the decision to take no action prospectively . . . to conform DOCS policy and conduct to the holding of *Earley* as well, right?
>
> . . .
>
> **A:** Correct.

Annucci Dep. 87:11-88:7; J.A. 197.

**B.     Brian Fischer**

Brian Fischer was the commissioner of DOCS from January 2007 to April 2011 (when DOCS merged with DOP to form DOCCS). He understood *Earley I*'s holding and agreed with Annucci's decision not to follow its holding:

> **Q:** But the decision to continue basically enforcing that policy [of administratively adding PRS to inmates' sentences] notwithstanding *Earley*, is it fair to characterize that as an operational decision?
>
> **A:** Yes.
>
> **Q:** And that was a decision you took early on in your tenure as commissioner, right, to continue that policy?
>
> **A:** That's correct.
>
> **Q:** And when you made that decision I assume you understood that what that meant was that inmates would continue to get post-release supervision, be subjected to it upon release, be reincarcerated for violating post-release supervision going forward, notwithstanding the fact that the Second Circuit Court of Appeals had made it clear that that violated the federal constitutional right to due process?
>
> . . .
>
> **A:** That was our position.
>
> **Q:** That was your position?
>
> **A:** We continued, correct.

> **Q:** And that was a decision that you felt comfortable making, right?
>
> **A:** Yes.

Fischer Dep. 40:12-41:14; J.A. 224.

**C.    Terence Tracy**

Terence Tracy was the chief counsel of DOP from December 1996 until March 2011. Like the other defendants, Tracy testified that he understood what *Earley* meant for DOCS and DOP and decided not to follow its holding. Tracy testified that he did not review any DOP files to determine whether DOP was supervising any inmates whose PRS terms had been administratively added by DOCS because he believed that reviewing the files was the responsibility of DOCS. Tracy Dep. 17:5-19:11; J.A. 249-50. But he never conveyed this belief to anyone at DOCS or had any conversations with anyone at DOCS about *Earley I*. Tracy Dep. 19:12-23; 24:2-10; J.A. 250-51. Even without reviewing DOP files or discussing *Earley I* with DOCS employees, Tracy testified that he knew that DOCS was adding PRS terms to sentences, that this had implications for DOP, and that after weighing the alternatives he affirmatively decided to continue DOP's former approach in contravention of *Earley I*:

> **Q:** . . . [W]hen you first read the *Earley versus Murray* decision from the Second Circuit Court of Appeals, I take it from your testimony you were aware of the way DOCS was entering post-release supervision

terms into their system as you've testified to earlier today; right?

**A:** Correct.

**Q:** And as I understand your testimony, you recognize when you read *Earley* that there was a need to go back and look at these sentence and commitment orders to determine who amongst the inmate population and the people under Department of Parole had had post-release supervision entered into the system even though it did not appear on their sentence and commitment orders; right?

. . .

**A:** All I know from reading that decision is that this decision could have an impact upon our population. Because I did know at the time that there were individuals coming into state custody and then coming under our jurisdiction for supervision purposes who had no period of post-release supervision stated on their sentence and commitment order.

Tracy Dep. 40:25-42:2; J.A. 253-54.

**Q:** But I am correct, am I not, that in weighing these two competing interests concern for people who you would be continuing to incarcerate or supervise without authority and/or freeing or lifting the supervision of individuals who may turn out to actually have a constitutionally imposed sentence of post-release[] supervision, your determination was to err on the side of continuing supervision and continuing incarceration until you could get those people back before courts; right?

. . .

**A:** Yes. That's the decision that the agency arrived at, yes.

**Q:** Okay. And was that consistent with your own view as well?

**A:** Yes, that was consistent with my own view as well.

Tracy Dep. 69:9-70:2; J.A. 258-59.

In short, the three defendants decided not to comply with *Earley I* although they understood the meaning of its holding and that its holding applied to their departments.  As a result, after our decision in *Earley I*, DOCS continued to violate its holding prospectively, by entering statutorily-required PRS terms when sentence and commitment orders were silent, and both DOCS and DOP continued to violate it retrospectively, by taking no steps to cease enforcing PRS terms that had been added to sentences by DOCS employees.

**V.    The Defendants' Actions after New York State Court Decisions on Administratively Adding PRS Terms**

The defendants' later responses to the subsequent state court decisions holding that a judge must pronounce PRS for it to be a part of an inmate's sentence contrasted starkly with their inaction following *Earley I.*

In either February or March 2007, shortly after the Second Department decided *Smith*, 37 A.D.3d 499, 829 N.Y.S.2d 226, the first Appellate Division case applying the holding of *Earley I*, DOCS began to review its files to identify inmates whose sentences included PRS terms added by DOCS employees.  The reviewers began by examining the sentence and commitment orders that are

included in every inmate's file. These documents allowed the reviewers to infer whether a judge had pronounced a PRS term at sentencing. If the sentence and commitment order did not mention PRS, the reviewers would attempt to examine sentencing transcripts, which were missing from the majority of inmate files. The reviewers created a new "PRS" data field in the DOCS computer system. This field indicated whether or not the inmate's sentence and commitment order contained PRS as part of the sentence. For inmates who had already been released from custody, the "PRS" field indicated that the inmate's file was no longer in DOCS's possession.

In April 2007, DOCS employees completed their initial review, which included over 40,000 inmate files; however, they did nothing with this information. At the same time, DOCS continued to administratively update the "PRS" data field for new inmates entering the system. As of January 2008, DOCS employees had made 49,300 entries in the "PRS" data field. Of these, 41,000 reflected sentence and commitment orders that included PRS terms as part of the sentence, while 8,100 indicated that the sentence and commitment order was silent as to PRS, leading to the conclusion that DOCS had added the terms to these inmates' sentences. Of the 8,100, 6,300 were in DOCS custody and 1,800 had been released to the supervision of DOP.

The New York Court of Appeals decisions in *Garner* and *Sparber* on April 29, 2008—more than 22 full months after *Earley I* and 19 months after we denied reconsideration in *Earley II*—prompted DOP to take its first steps and DOCS to take its first significant steps toward compliance with *Earley I*.

DOP promptly reviewed its records to determine which inmates under its supervision were subject to DOCS-imposed PRS terms, a process that took less than a week.

By the middle of May 2008, DOCS launched a "Post-Release Supervision Resentencing Initiative" to obtain resentencing of individuals in its custody whose sentencing judges had not pronounced PRS terms required by § 70.45. In this undertaking, DOCS relied on the data collected during its earlier review of inmate files that identified inmates whose sentence and commitment orders were silent about PRS. The initiative required an additional investigative step—DOCS had to obtain the sentencing minutes for all 8,100 inmates with silent sentence and commitment orders, the majority of whose files lacked minutes. Thereafter, as DOCS identified specific inmates who needed to be resentenced or whose sentencing minutes were missing, DOCS employees emailed the information to district attorneys and sent formal notifications, including the sentence and commitment orders and available

sentencing minutes, to both the relevant sentencing courts and district attorneys.

Finally, on June 4, 2008, DOCS and DOP filed a declaratory judgment action in state court seeking judicial approval of a plan that would permit state agencies, district attorneys, and state courts to systematically identify and refer improperly sentenced inmates back to the sentencing courts to be resentenced. The state court, however, did not grant the injunctive relief sought by DOCS and DOP.

The defendants all testified that immediately after *Earley I* and *II* were decided in 2006 they could have undertaken the remedial measures that they later took when prompted by *Smith*, *Garner* and *Sparber* in the spring of 2008. Annucci Dep. 81:10-82:9; Fischer Dep. 60:23-61:21; Tracy Dep. 85:12-20; J.A. 195, 226, 260.

**VI.    The Legislative Response to *Earley I***

In June 2008, the New York legislature passed New York Correction Law § 601-d, which codified a process for resentencing individuals with unpronounced PRS terms. Section 601-d required DOCS and DOP to notify courts if they had custody of or supervision over a defendant with an administratively imposed PRS term and permitted the sentencing court either to resentence the defendant to a sentence that included a PRS term or, with the district attorney's consent, to decline to resentence, resulting in no PRS

term.  The latter course would not upset guilty pleas that were not premised on the inclusion of a PRS term in the sentence.

**VII.    Procedural History**

The plaintiffs are offenders who were subject to mandatory PRS terms and who allege that DOCS, rather than their sentencing judge, imposed these terms.   Their action seeks compensatory damages based upon administratively imposed PRS terms that continued or were imposed after June 9, 2006, the date *Earley I* was decided.

The defendants filed a Rule 12(b)(6) motion to dismiss on the basis of qualified immunity.  We affirmed the district court's denial of the motion in *Betances v. Fischer*, 519 F. App'x 39, 41 (2d Cir. 2013) (summary order) ("*Betances I*").  *Betances I* was decided on the same day as *Vincent v. Yelich*, 718 F.3d 157, 168 (2d Cir. 2013), in which we held that "*Earley I* itself clearly established that where the court has not included PRS in a defendant's sentence, DOCS may not add that term without violating federal law."   In *Betances I*, our remand directed the district court to develop the record "as to the objective reasonableness of [defendants'] efforts to relieve [plaintiffs] of the burdens of those unlawfully imposed [PRS] after [defendants] knew it had been ruled that the imposition violated federal law."  *Vincent*, 718 F.3d at 177.

On remand, the district court granted plaintiffs' motion to certify the case as a class action and, after the parties had cross-moved for summary judgment, denied defendants' cross-motion for summary judgment on the basis of qualified immunity and granted plaintiffs' cross-motion for summary judgment holding defendants personally liable.

After defendants noticed their appeal but before their brief was filed, the district court granted plaintiffs' motion to deem the appeal frivolous, which would have enabled the district court to retain jurisdiction and proceed with a trial on damages notwithstanding the appeal. Upon defendants' motion, we stayed the proceedings in the district court pending appeal.

## DISCUSSION

### I.    Qualified Immunity

The defendants first challenge the district court's denial of their motion for summary judgment and grant of the plaintiffs' motion for summary judgment on the questions of whether the defendants were entitled to qualified immunity and thus whether they can be held personally liable for the injuries inflicted on plaintiffs by their decision not to comply with *Earley I*.

We review a "grant of summary judgment de novo, construing all evidence in the light most favorable to the non-moving party, and affirming only where there is no genuine issue as

to any material fact and the movant is entitled to judgment as a matter of law." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (internal citation and quotation marks omitted).

We deny qualified immunity to government officials on summary judgment if (1) "the facts . . . taken in the light most favorable to the" officials establish "a violation of a constitutional right"; and (2) "the officials' actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *See Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006) (internal quotation marks omitted).

### A.    The Questions on Appeal

The questions we must resolve in this appeal are narrow. Our court has already concluded "that *Earley I* itself clearly established that where the [sentencing] court has not included PRS in a defendant's sentence, DOCS may not add that term without violating federal law." *Vincent*, 718 F.3d at 168. The court also deemed "clear" DOCS's constitutional "obligation to at least attempt to cease its administrative and custodial" enforcement of PRS terms that had been held unlawful under *Earley I*. *Id.* at 172-73. Accordingly, *Vincent* remanded for development of the record "as to the objective reasonableness of [defendants'] efforts to relieve [plaintiffs] of the burdens of those unlawfully imposed terms after [defendants] knew it had been ruled that the imposition violated

federal law." *Id.* at 177. This panel is bound by *Vincent*'s rulings as to what was clearly established by *Earley I*. Therefore, the only questions for us to resolve are (1) at what point in time would the defendants have reasonably known that DOCS's and DOP's actions violated federal law and (2) whether, after the defendants reasonably would have known that their conduct violated federal law, they made an objectively reasonable effort to comply with the holding of *Earley I*.

### B.    When Defendants Realized Their Conduct Violated Federal Law

The three defendants became aware of the implications of *Earley I*'s holding at different times. Annucci understood the implications of *Earley I* at least by June 20, 2006, when he emailed OCA's counsel and explained *Earley I*'s holding to him. Tracy testified that he became aware of and understood *Earley I* in late 2006 but he could not recall the precise date. Fischer also was unable to give a precise date upon which he became aware of and understood *Earley I*, but this probably took place no later than January 2007, soon after he became commissioner of DOCS.

Considering the dates in the light most favorable to the defendants, we assume that Tracy understood the holding of *Earley I* by December 31, 2006, and Fischer by January 31, 2007. As for Annucci, although he indisputably understood *Earley I* as of June 20,

2006, we conclude that he could reasonably have waited to take action until after August 31, 2006, the date on which we issued *Earley II*, denying the motion for rehearing.  We note that the district court must engage in factfinding on remand to determine with more specificity the dates that Tracy and Fischer understood the holding of *Earley I*, but should the district court determine that either defendant became aware of *Earley I* before August 31, 2006, liability may not be imposed for the failure to take action before that date.

**C.    Defendants' Efforts to Comply with *Earley I***

The defendants did not take objectively reasonable steps to comply with *Earley I* because, even viewing the evidence in the light most favorable to them, it took Annucci 19 months, Tracy 15 months,  and Fischer 14 months to take the first meaningful steps to bring their departments into compliance with *Earley I*.

All three confirmed that their noncompliance was not the result of oversight or confusion; they understood that *Earley I* required them to change their practices but affirmatively decided not to do so.

It was only after the Second Department decided *Smith*, 37 A.D.3d 499, 829 N.Y.S.2d 226, the first Appellate Division case applying *Earley I*, on February 6, 2007, that Annucci and Fischer took any action at all.  In six weeks, DOCS employees reviewed inmate files to determine who had PRS terms that had been added by DOCS

employees rather than imposed by a judge. But while this review would be essential to any remediation of retrospective violations of *Earley I*, the step was insufficient on its own. DOCS employees simply sat on the information they had collected. Moreover, they continued to violate *Earley I* prospectively, by persisting in administratively adding PRS terms to the sentences of inmates whose sentence and commitment orders did not include them.

Throughout this period, Tracy took no steps to bring DOP into compliance. He did not discuss *Earley I* with anyone at DOCS, although he knew that DOCS was disregarding its holding and continuing to administratively impose PRS terms.

Finally, prompted by the New York Court of Appeals' decisions in *Garner* and *Sparber*, the defendants in late April and early May 2008 took their first meaningful steps to remediate DOCS's and DOP's PRS practices. It was at this point that (1) DOCS launched a "Post-Release Resentencing Initiative," which notified courts and district attorneys of inmates who might need to be resentenced; (2) DOP reviewed its files to determine who under their supervision had PRS terms added by DOCS; and (3) DOCS and DOP together filed a declaratory judgment action seeking judicial approval of a mass-resentencing plan. These actions were reasonable steps towards bringing DOCS and DOP into compliance with *Earley I*, but they had been unreasonably delayed. Between 14

and 19 months had elapsed from when the defendants understood that *Earley I* required them to act. And all three defendants have admitted that nothing prevented them from taking these same actions when they first understood the requirements of *Earley I*. That the defendants eventually took reasonable steps to comply with *Earley I* cannot excuse their unreasonable delay in doing so.

The defendants' refusal to bring DOCS and DOP into conformity with *Earley I* until the New York state court rulings causes us to question whether, absent these later rulings, any compliance would have been forthcoming. DOCS only began its initial review of its files directly after the Appellate Division first applied *Earley I*, and the defendants conceded that *Sparber* and *Garner*, not *Earley I*, prompted the efforts they undertook in the spring of 2008. While defendants appear to have chosen to ignore our ruling until New York state courts directed them to change their conduct, this fact does not affect our analysis. Even assuming that their actions in the spring of 2008 were motivated by a belated desire to comply with *Earley I*, the unexcused delay of 14 to 19 months between *Earley II* and their first significant remedial efforts was objectively unreasonable.

### D.    Defendants' Counterarguments

The arguments advanced by the defendants are unpersuasive. Their principal arguments are that (1) their only responsibility was

to prepare for individual resentencings; (2) resentencing the affected offenders presented significant practical difficulties; and (3) New York state judges and district attorneys were resistant to *Earley I* and this prevented the prompt implementation of its holding. We address each in turn.

### 1. The Scope of Defendants' Responsibilities

The defendants seek to diminish the scope of their obligations under *Earley I* by arguing that they reasonably believed that their only responsibility was to prepare for individual resentencings when requested by the defendants.

This argument makes no sense when applied to the subset of offenders who suffered prospective PRS violations—that is, those whom DOCS took into custody after we denied rehearing of *Earley I*. The appropriate remedy for these offenders was not to administratively add the PRS term and then prepare for resentencing if and when requested. DOCS's duty was to enter the sentence imposed by the judge, and that sentence only, without the PRS term required by § 70.45, and then to ensure that, by the time the inmate left the custody of DOCS to begin serving any PRS term, the term had been pronounced by a judge.

The argument is more plausible, but still unsuccessful, when applied to the offenders who suffered retrospective PRS violations: those in the custody of DOCS when *Earley II* was decided who had

yet to start serving their unpronounced PRS terms; those serving unpronounced PRS terms when *Earley II* was decided; and those reincarcerated for violations of such terms after *Earley II*.  It is true that when *Earley I* was decided there was no formal remedy for addressing the problem of unpronounced PRS terms.  However, defendants' launching of the resentencing initiative in 2008 coupled with their filing of the declaratory judgment action undercuts their claim that their only role was to passively wait for inmates to file their individual lawsuits.  When they saw fit to remediate the situation they showed that they could take prompt and reasonable steps to do so.

## 2.  The Practical Difficulties of Resentencing

To be sure, resentencing all the violent felons with unpronounced PRS terms presented practical difficulties and required DOCS and DOP to devote significant resources to the undertaking.  There are two reasons, however, why these difficulties do not persuade us that the defendants made objectively reasonable efforts to comply with *Earley I*.

First, the defendants overstate what compliance with *Earley I* would have required.  *Earley I* did not require them to "conven[e] resentencing hearings for thousands of violent-felony offenders . . . on [their] own," Appellant's Br. 51, nor would it have required them to "notify[] state courts or prosecutors of each of the eight thousand

individuals they had identified as potentially requiring resentencing," *id.* at 55, all at once, thereby overwhelming the court system. Instead, they simply had to undertake "objective[ly] reasonable[]" efforts to comply with *Earley I*, which we have previously characterized as "at least attempt[ing] to cease [their] administrative and custodial operations that had been held to violate federal law." *Vincent*, 718 F.3d at 172-73, 177. Contrary to what the defendants assert, therefore, making "objective[ly] reasonable[]" efforts to comply with *Earley I* was well within their power and did not require them to do the impossible or even the unreasonable.

The second answer to defendants' argument based on the logistical difficulties of resentencing is that the same supposed difficulties did not prevent them from taking appropriate actions after they decided to do so 14 to 19 months after we decided *Earley II*. Each defendant testified that nothing prevented him from taking these steps back in 2006, and the logistical difficulties did not decrease in the interim.

### 3.  The Resistance of Other Parties to *Earley I*

We accept the defendants' claim that other state actors with responsibility for resentencing, such as judges and district attorneys, were resistant to *Earley I's* holding, although we note that the Second and Fourth Departments of the Appellate Division applied *Earley I*

prospectively without resistance.  *See Smith*, 37 A.D.3d 499, 499, 829 N.Y.S.2d 226; *Goord*, 48 A.D.3d 1306, 1307, 853 N.Y.S.2d 756. However, even if all other actors in the state sentencing system were entirely resistant to *Earley I*, we must still answer the question whether defendants themselves undertook "objective[ly] reasonable[] . . . efforts to relieve [plaintiffs] of the burdens of those unlawfully imposed terms after [defendants] knew it had been ruled that the imposition violated federal law."  *Vincent*, 718 F.3d at 177. The efforts made, or not made, by other parties are beside the point for the purposes of determining qualified immunity.[2]

As the steps taken by defendants in the wake of *Garner* and *Sparber* demonstrate, they could act in compliance with *Earley I* without the cooperation of state judges and district attorneys.  The filing of a declaratory judgment action seeking approval of a resentencing plan did not require the approval or cooperation of other state officials.  Similarly, the decision to review their records and notify state judges and district attorneys about defendants who needed to be resentenced required no cooperation from others.  If the district attorneys and judges ultimately rejected compliance, the resentencings would not have taken place, but the defendants would

---

[2] We have no occasion on this appeal to consider how, if at all, the actions of others might inform any assessment of causation for specific injuries claimed by plaintiffs against these defendants.  Such matters can be pursued as warranted on remand.

have satisfied their obligation, which was to make an "objective[ly] reasonable[]" effort, *Vincent*, 718 F.3d at 177, to comply with *Earley I*.

In sum, we agree with the district court that the defendants did not make an objectively reasonably effort "to relieve [plaintiffs] of the burdens of those unlawfully imposed terms after [they] knew it had been ruled that the imposition violated federal law." *Id.*

**II.     Motion to Deem the Appeal Frivolous**

The defendants attack the district court's decision to grant plaintiffs' motion to deem the appeal frivolous so that the district court could retain jurisdiction and proceed with a trial on damages while the appeal was pending.  This issue is moot because the defendants obtained a stay of further proceedings in the district court and thus there is no need to consider it.

We have considered the parties' remaining arguments and find them without merit.

**CONCLUSION**

For the reasons stated above, we AFFIRM the judgment of the district court and REMAND for further proceedings consistent with this opinion.